## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO: 3:09-CR-19-MR-DCK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| CHARLES ALLEN HALL, | ) | |
| | ) | |

**THIS MATTER** is before the Court upon the "Motion to Suppress Evidence" (Document No. 11) filed on April 1, 2009 by Defendant Charles Hall ("Hall"). The United States opposes the motion. (Document No. 14). After several continuances requested by the Defendant, evidentiary hearings were held on June 30, 2009, and July 8, 2009, with the Defendant personally present with counsel.[1] At the conclusion of the hearing on July 8, 2009, defense counsel asserted for the first time that the warrant was invalidly issued. In order to have the full arguments of the parties before the Court, the undersigned ordered additional briefing, which both parties filed on the afternoon of July 16, 2009. (Document Nos. 33, 34). The United States filed an exhibit for the supplemental brief on July 21, 2009. (Document No. 37-2). Having fully considered the briefs, testimony, evidence, and oral arguments, the undersigned recommends that the Defendant's motion be **denied**, based upon the following proposed findings of fact and conclusions of law:

### I. Issues Before the Court

In his motion, Hall asserts that: 1) law enforcement officers cannot enter a residence to search for the person named in a misdemeanor arrest warrant; 2) the officers did not have adequate "reason

---

[1] The hearing resumed on July 8, 2009 in order to accommodate the Defendant's attempts to obtain the attendance of an incarcerated defense witness. (TR 138-41).

to believe" that he was inside his residence;  3) the officers exceeded the scope of a protective sweep of the residence; and 4) any evidence gained as a result of constitutional violations should be excluded from evidence.  (Document No. 11, pp. 4-6).

The United States responds that 1) the officers could lawfully enter the residence to execute the arrest warrant regardless of whether it was for a misdemeanor or a felony; 2) the officers had good reason to believe that Hall was hiding inside his residence; 3) under the circumstances confronted by the officers, the scope and duration of the search for Hall inside the residence in order to execute the arrest warrant was constitutionally reasonable; and 4) while lawfully inside the residence and looking only in places where Hall might have been hiding, officers observed incriminating evidence in "plain view."

At the conclusion of the second hearing, Hall further asserted that: 1) the arrest warrant was invalidly issued, and 2) the overall duration of the execution of the arrest warrant (approximately six hours) was constitutionally "unreasonable."  With respect to the validity of the arrest warrant, Hall pointed out that the cover sheet presented to the issuing magistrate by the investigating officer could not be located for the hearing,

The United States orally responded to Defendant's newly-asserted arguments and reiterated that 1) the arrest warrant was valid;  the fact that the cover sheet was later lost at the scene is irrelevant; and in any event, the officers obtained and executed the arrest warrant in good faith; and 2) upon execution of the arrest warrant, the officers then left the premises; and the duration was only long enough to accomplish the job under the circumstances, *i.e.* to safely locate and arrest the criminal suspect hiding in the residence.

Given the Defendant's assertion of additional issues regarding the alleged invalidity of the arrest warrant, this Court entered an order directing both parties to file a brief concisely addressing this question: "Assuming *arguendo* that the misdemeanor arrest warrant naming the Defendant was not validly issued, is this situation covered by the good faith exception, as set forth in *United States v. Leon*, 468 U.S. 897 (1984), and as further developed in successive cases, including *Herring v. United States*, – U.S. –, 129 S.Ct. 695 (2009)?" (Document No. 30, "Order").

In his supplemental brief, Hall presented several arguments under *Leon,* but did not mention the United States Supreme Court's decision in *Herring v. United States*. Specifically, he argued that *Leon*'s good-faith exception should not apply because 1) "Officer Helms did not provide the state magistrate with an affidavit to support probable cause," and 2) "the state magistrate acted as a 'rubber stamp' for the police by failing to follow the rules regarding issuance of warrants." (Document No. 34, p. 1). He further asserted that "the evidence should also be dismissed because the North Carolina constitution does not recognize the good-faith doctrine. (*Id.*).

In its supplemental brief, the United States asserted that 1) the state arrest warrant was validly issued upon probable cause, and 2) even assuming the warrant were found invalid, *Leon* and *Herring* would not require suppression because Officer Helms acted in good-faith and in objectively reasonable reliance on a facially-valid warrant issued by a detached and neutral magistrate. (Document No. 33, p. 4).

## II. Finding of Facts

The essential facts regarding the arrest of Hall at his residence are largely undisputed, although several discrepancies between the officers' testimony and the lone defense witness' testimony will be noted. At the first hearing, six Charlotte-Mecklenburg Police Department

("CMPD") and/or SWAT officers testified: Officers C. Brent Helms, Jason Dority, James Hettrick, Michael Abbondanza, William Parks, and Harlon McKinney. At the second hearing, a seventh police officer (CMPD Officer Timothy Parker) and an incarcerated defense witness (Thomas Phillips) testified. The United States also introduced various exhibits, including copies of email communication between the investigating officer and the District Attorney, the "papering packet" of information used to obtain the arrest warrant, the arrest warrant, and various photographs taken at the scene of the arrest.

In 2008, Officer Helms investigated Hall's suspected involvement in thefts of catalytic converters. According to the testimony and the police reports in this case, Hall was well known to Officer Helms and other police officers as a convicted felon with a very extensive criminal history.[2] (Document No. 32, Hearing Transcript "TR" at 15, lines 20-23). Hall had fifteen (15) felony convictions and over one hundred (100) arrests for various criminal offenses, including violent crimes, weapons and drug charges, and theft offenses. (TR 63).

The police report by Officer Helms indicates that on April 8, 2008, at approximately 10:00 a.m., he met with Assistant District Attorney Reed Hunt ("Hunt") regarding his investigation of Hall's alleged involvement in thefts of catalytic converters. Officer Helms, as lead investigator on the case, went to the D.A.'s office with the paperwork ("papering packet") to obtain a felony arrest warrant. However, Hunt determined that the thefts totaled less than the $1,000.00 threshold amount and approved a misdemeanor charge instead. (TR at 17, lines 8-11; at 178, lines 8-25). Officer Helms then proceeded to a state magistrate, who considered the information provided by Officer

_____

[2]In the "Order of Detention," dated February 25, 2009, United States Magistrate Judge Carl Horn noted that the "Defendant has one of the longest criminal records I have ever seen, perhaps the longest."

Helms under oath, reviewed the documentation, and issued a warrant for Hall's arrest. (TR at 34, 36). The warrant directed officers to arrest Charles Hall and bring him without unnecessary delay before a judicial officer to answer to the misdemeanor criminal charge of larceny.

CMPD Officers Helms, Dority, Baucom, and Creech, all went to Hall's residence at the corner of 3614 W. Sugar Creek Road, in Charlotte North Carolina, to serve the arrest warrant. (TR at 19-20, 40-41). When they arrived, they observed Hall's vehicle, a cream-colored Cadillac El Dorado, in the driveway. (TR 73). Officer Helms knew that Hall lived at this address. (TR at 20, lines 1-3). Two officers approached the front door of the residence, and two officers approached the rear door. (TR at 20, lines 16-18). Officers Baucom and Helms knocked and announced "Police" on the front door with no response. Officers Creech and Dority knocked and announced "Police" at the back door for several minutes with no response. (TR at 68). These two officers then stepped away from the back door and stood about 10-12 feet from it. An African-American adult male came to the back door, opened it briefly, mumbled something, and then shut the door.[3] (TR at 20, 23, 66-67, 70-71). Officer Dority then reported to Officer Helms that he had observed a person come to the rear door, but then disappear from view inside. Both pairs of officers then continued to knock and announce "Police" at the respective doors, with no response. (TR at 66-69).

While the other officers remained at the residence, Officer Helms went to get a service copy of the arrest warrant. He testified that the officers needed a service copy before entering the residence to serve the warrant. (TR at 22). When he returned, the officers had still not received any response from within the residence. After Sergeant Bednarick and Captain Leonard arrived, they

---

[3]At the second hearing, this individual - Thomas Phillips – indicated that the screen door was latched and that he had briefly opened the inner door.

notified the SWAT team of the situation. In light of the circumstances, including Defendant's extensive and violent criminal history, SWAT agreed to assist. (TR at 22). Members of SWAT began arriving and set up a "command" post several houses away. (TR 75-76). In accordance with established SWAT protocol, they used a loudspeaker in an effort to verbally coax anyone inside the residence to come out peacefully.

Hall's wife (Jeena C. Hall), her two young children, and Thomas Phillips ("Phillips") eventually emerged from the front door of the residence. Phillips was the person who had appeared briefly at the back door. Jeena Hall used profanity at the officers and told them that her husband was not inside. (TR at 51). However, Phillips advised several officers that the Defendant was hiding inside the residence, was not coming out, and "was not going back to jail." (TR at 55, 68, 79, 91). Officer Helms specifically asked Phillips several times, and Phillips repeatedly insisted that Hall was inside and was not coming out. (TR at 27-29). Phillips later denied making these statements.

Following protocol, SWAT officers continued to use the loudspeaker in an effort to verbally coax Hall to come out peacefully. After receiving no response for several hours, SWAT officers decided to enter in order to locate and arrest Hall. SWAT member and CMPD Officer James Hettrick testified that, to approach the residence, they initially used a bulletproof vehicle with special cameras, including a "Remington eyeball" and a 28 foot "polecam." (TR 78, 87-88). To use the cameras, it was necessary to break several windows as the first step in gaining entry into Hall's residence. The cameras were inserted into windows to view the interior and thereby detect the possible presence of individuals who could pose a threat to the officers' safety. (TR 151). The cameras did not reveal any persons, although the house was extremely cluttered.

The SWAT officers finally entered and fanned throughout the house to look for Hall in a methodical search ("the primary clear"), but did not initially locate him in any obvious places. (TR at 79, 94, 115-116). When SWAT Officers Parks and Abbondanza entered the right rear bedroom to look for Hall, they checked a large pile of clothing (approximately four feet deep) on the bed, and in doing so, noticed the butt stock of a rifle protruding from under the clothing next to the wall. Officer Parks immediately handed this .22 caliber rifle out to other officers while they continued to look for Hall. (TR at 103, 112). These SWAT officers testified that they only looked in places where a person could hide, and that the house was extremely cluttered. (TR at 117).

Officers did not initially locate Hall and reported this to the outside officers, who then conferred again with Phillips. According to Officer Helm's testimony, Phillips "adamantly" and repeatedly insisted that Hall was hiding inside the residence. SWAT Officer Hettrick also spoke with Phillips at the nearby command center and later testified that Phillips had insisted that Hall was hiding inside the residence. (TR at 79-80). SWAT Officer Hettrick called Sergeant Peterson, who confirmed that officers had continually maintained outdoor surveillance of the perimeter of Hall's residence and that no one had emerged from it. (TR at 80, 92, 113-114).

SWAT officers continued to look for Hall inside the residence. SWAT Officers Harlon McKinney and Mark Lester went up into the attic to see if Hall was hiding there. SWAT Officer McKinney testified that he noticed that the mortar in the chimney was coming apart. (TR 131). He also noticed that the attic was covered with insulation except for one place next to the chimney, where the floor was covered with two strips of tar paper. (TR 121-122, 132). When he lifted up the tar paper, he found Hall hiding down in a narrow space next to the chimney. When Officer

McKinney told him "let me see your hands," Hall swore profanity at the officer and spit at him. (TR at 123).

The officers retrieved Hall from inside the wall, amidst the insulation, dust, and debris. Hall physically resisted arrest, swore at the officers, and spit in several more SWAT officers' faces. (TR at 125). The extraction took some time, because as Officer McKinney testified, they had to take apart a section of wall to safely extract Hall from his narrow hiding place, as nails and wires protruded from old boards in the wall. He testified that Hall could not exit the way Hall had entered without risking serious injury. (TR 126). The United States introduced several photographs showing Hall in his very cramped hiding place. See Gov. Hearing. Ex. 2-3.

Officers took written statements from Mrs. Hall and Phillips. Both denied owning the two firearms found in Hall's residence. (TR at 61). Hall was transferred to Carolinas Medical Center to address any potential injury sustained while hiding inside the wall. Several officers were treated at the hospital due to suffering from the inhalation of dust, airborne insulation and other debris.

### III. Conclusions of Law

#### A. Fourth Amendment

A person's right to be free from unreasonable searches and seizures arises from the Fourth Amendment to the United States Constitution, which specifically provides:

> "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Constitution, amend. IV.

A person claiming the protection of the Fourth Amendment must have a legitimate expectation of privacy in the invaded place. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). A defendant moving for suppression has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search and seizure. *Katz v. United States*, 389 U.S. 347, 352-53 (1967). The Defendant was inside his own residence and would certainly have a legitimate expectation of privacy there. *Payton v. New York*, 445 U.S. 573, 590 (1980) ("the Fourth Amendment has drawn a firm line at the entrance to the house ").

## B. Misdemeanor Arrest Warrant

The Defendant alleges that law enforcement officers could not lawfully enter his residence to arrest him on a misdemeanor arrest warrant. Although the Defendant cites *Payton v. New York* in support, the Defendant's reliance on *Payton* for this proposition is misplaced. There, the United States Supreme Court held that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603.

The Defendant's argument is based on the notion that because the *Payton* case involved a felony offense, misdemeanor offenses are somehow excluded from the range of the Supreme Court's decision. Defendant may not accurately draw this conclusion from *Payton*. The Supreme Court did not distinguish between felony and misdemeanor warrants. Defendant cites no other applicable authority for his contention that police officers may not enter a residence to arrest a suspect on a misdemeanor warrant.

Numerous circuits to consider the issue have held that *Payton* <u>does</u> apply to misdemeanor warrants and that police officers have authority to enter a home based on a misdemeanor warrant.

*See United States v. Spencer,* 684 F.2d 220, 222-24 (2d Cir. 1982), *cert. denied*, 459 U.S. 1109 (1983); *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005); *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006); *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998); *United States v. Lloyd*, 396 F.3d 948 (8th Cir. 2005), *cert. denied*, 545 U.S. 1110 (2005); *United States v. Albrektsen*, 151 F.3d 951 (9th Cir. 1998). These cases all hold that officers do not violate a suspect's Fourth Amendment rights by entering a residence to arrest the suspect for a misdemeanor offense. The United States draws the Court's attention to several unpublished Fourth Circuit opinions indicating that warrants for misdemeanor offenses provide a right of entry to officers. *See, e.g., Kuklane v. Whittington*, 37 F.3d 1494, 1994 WL 564750, *2 (4th Cir. 1994) (unpublished) (noting that officers should have obtained an arrest warrant for the misdemeanor offense before entering the residence).

The United States Supreme Court has explained that "because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." *Steagald v. United States*, 451 U.S. 204, 214 n. 7 (1981). This reasoning applies regardless of whether the warrant is based on a felony or a misdemeanor.

Hence, as the United States correctly asserts, the SWAT officers' entry into the residence for the purpose of executing a warrant for a misdemeanor larceny offense was lawful and did not violate the Fourth Amendment. The United States further notes that the officers' actions were consistent

with North Carolina state law, which authorizes police officers with a state arrest warrant to enter the residence to make the arrest.  See N.C.G.S.A. § 15A-401.[4]

### C.  The Officers Had Reason to Believe Hall was Inside the Residence

Hall next contends that the officers did not have "reason to believe" that he was inside his residence.  This contention is without merit.  From past arrests and convictions, officers knew that Hall resided at this location.  (TR at 20).  When the officers arrived, they observed Hall's Cadillac in the driveway.  Subsequently, they observed his wife and children exit from the residence.  Hall's friend (Phillips) also emerged.  According to multiple officers, Phillips repeatedly and adamantly told them that Hall was hiding inside and "was not going back to jail." (TR at 27-29, 55). Although Phillips later claimed at the hearing that he did not so advise the officers, the undersigned found the officers' testimony to be consistent, forthright, and fully credible in all respects.   Under the circumstances, the officers had sufficient "reason to believe" that Hall was hiding inside and refusing to come out. *Payton*, 445 U.S. at 603; and see, e.g., *United States v. Clayton*, 210 F.3d 841, 842 (8th Cir. 2000) (finding that police had reason to believe the suspect was within, because a person inside the house told police the suspect was within).

---

[4]N.C.G.S.A. § 15A-401 (e)(1), which is co-extensive with federal constitutional requirements, provides that: "A law-enforcement officer may enter private premises or a vehicle to effect an arrest when:  (a) The officer has in his possession a warrant or order or a copy of the warrant or order for the arrest of a person..., (b) The officer has reasonable cause to believe the person to be arrested is present, and (c) The officer has given, or made reasonable effort to give, notice of his authority and purpose to an occupant thereof, unless there is reasonable cause to believe that the giving of such notice would present a clear danger to human life." N.C.G.S.A. § 15A-401 (e)(2) further provides that: "The law-enforcement officer may use force to enter the premises or vehicle if he reasonably believes that admittance is being denied or unreasonably delayed, or if he is authorized under subsection (e)(1)(c) to enter without giving notice of his authority and purpose."

Defendant relies entirely on the testimony of Phillips and ignores the other relevant evidence of record in arguing that the police lacked "reason to believe" Hall was inside. However, the testimony of this defense witness was simply not believable and was contradicted by the consistent and thoroughly credible testimony of multiple officers, who indicated that Phillips had insisted that Hall *was* inside. Even without Hall's statements to police, the remaining circumstances might have provided the officers with sufficient reason to believe Hall was inside, as Hall's car was in the driveway of his own residence, and his family and a friend had just emerged from within. See, e.g., *Shreve*, 453 F.3d at 689 (observing that "automobiles were at the house, signaling that people were home").

### D. Scope and Duration of Sweep of Residence, Seizure of Firearms

To the extent Hall complains about the "duration" of the officers' efforts to locate him inside his residence, Hall refused to come out and hid from police in order to evade arrest, and thus, has only himself to blame for any delay. The officers knocked at the doors of Hall's residence intermittently for approximately 45 minutes, used a loudspeaker in an attempt to coax him out, and gave Hall ample time to respond before they entered. Although the overall execution of the arrest warrant took approximately six hours, the necessary thoroughness of the search for Hall was largely due to Hall's own evasive behavior. Given Hall's extensive and violent criminal history, and given that the officers reasonably believed he was hiding inside, the officers' efforts to find Hall and safely execute the arrest warrant were "reasonable" under the circumstances. Additionally, the extraction of Hall from his hiding place was done carefully to avoid injury to Hall.

The Defendant also contends that the officers exceeded the "scope" of a lawful protective sweep when they seized several firearms found within the residence. The United States responds

that pursuant to the arrest warrant, the officers were authorized to enter the residence and perform a "protective sweep" of the house to look in any places where the Defendant might be hiding. *Maryland v. Buie*, 494 U.S. 325, 331 (1990). In *Buie*, the United States Supreme Court held that the Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officers possess a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those at the scene. "[T]he arrest warrant gave the police every right to enter the home to search for Buie" and once inside, "the potential for danger justified a limited protective sweep." (*Id*. at 334 fn.1).

During the sweep, if an officer observes an "item that is perceived to be contraband, stolen property, or incriminating in character," the officer may seize those items under the "plain view" doctrine. *United States v. Jackson*, 131 F.3d 1105, 1108-09 (4th Cir. 1997). "[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *(Id.*, citing *Horton v. California*, 496 U.S. 128, 136-137 (1990) (holding that officers may properly seize articles of incriminating character observed while performing a search pursuant to a valid warrant)); *see also, United States v. Uzenski*, 434 F.3d 690, 707 (4th Cir. 2006); *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996). This principle extends to what is often called "plain feel" for incriminating items that are detected by the touch of an officer during a lawful search. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Raymond*, 152 F.3d 309, 312 (4th Cir. 1998).

With respect to the first rifle seized, Defendant contends that the officers exceeded the scope of the sweep by feeling and/or moving some clothing piled four feet deep on the cluttered bed while checking to see if the Defendant was hiding underneath. SWAT Officers Abbondanza and Parks both testified that in doing so, they observed the butt end of a rifle "up against the wall" protruding from underneath the piled clothing. (TR 103-104, 107, 112). The undersigned found the officers' testimony to be consistent, straightforward, and credible in all aspects. Their testimony establishes that this firearm was observed in "plain view" and was properly seized. *Horton*, 496 U.S. at 136-37; *Dickerson*, 508 U.S. at 375; *Raymond*, 152 F.3d at 312. The three requirements for plain view (or "plain feel") seizure were all met.

The United States points out that the officers testified that it took them about ten minutes to check for Hall in the closet, in some large bins, under the bed, or under the piled clothing four feet deep on the bed. (TR 112, 117-118 "We checked everything in that room where a person could fit."). A large amount of clutter was stacked "knee deep" around the bed, which made it difficult to maneuver. Given the extent of clutter in the room, Hall could have been hiding in any number of places, including underneath the piled clothing on the bed. Thus, the officers could reasonably check there for him. Given that Hall was a violent felon believed to be hiding from the officers to evade arrest, the United States asserts that the officer's brief "feeling" of the piled up clothing to check for the presence of Hall was reasonable under the circumstances. (Document No. 14, p. 5). The Fourth Amendment bars only "unreasonable" searches and seizures. *Buie*, 494 U.S. at 330.

With respect to the second firearm seized (a 30.06 rifle), SWAT Officer Parker found it while looking for Hall through a vent to a "large circular air duct" with no filter inside. (TR at 152-154, 166); Gov. Exh. 6. SWAT Officer Parker testified that he could see that it went "down into the

crawl space underneath the house and towards a hallway closet." (TR at 154, lines 7-8). He testified

that the opening was large enough for a person to fit into. (TR at 152, 155). Officers may make a

cursory inspection of any places where a suspect might hide. *Buie*, 494 U.S. at 335. SWAT Officer

Parker observed a rifle bag stashed "right inside" the air duct where Hall could "grab it easily from

outside." (TR at 154-155, 158). He testified that he recognized it immediately as a rifle bag because

he had several like it himself. (TR at 157). The incriminating nature of the item as a rifle bag (and

thus, likely to contain a rifle) was immediately apparent to the officer. *Jackson*, 131 F.3d at 1109.

The officer knew that Hall was a convicted felon who could not lawfully possess firearms.[5]   SWAT

Officer Parker was not required to leave it in its location where the suspect might retrieve the

firearm, thereby posing a very serious danger to officers. When he removed the rifle bag from the

duct, his suspicion that the bag contained a rifle was readily confirmed by "plain feel." *Dickerson*,

508 U.S. at 366;  *Raymond*, 152 F.3d at 312. The seizure of the rifle bag and firearm was

permissible. *Dickerson*, 508 U.S. at 377 ("the suspect's privacy interests are not advanced by a

categorical rule barring the seizure of contraband plainly detected through the sense of touch").

Given that Hall, a felon with a lengthy and violent history, was hiding from police inside his

own home to evade arrest, the police were justified in carefully and thoroughly looking for him in

any possible hiding places, including a large pile of clothing and an air duct, and in confiscating

firearms found while looking for Hall.

### E.  Fruit of Poisonous Tree

---

[5] Even if the officer who seized the firearm did not personally know that Hall was a convicted felon, "it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of the seizure." *United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996).

Hall argues in his motion that "evidence obtained as a result of a constitutional violation may not constitute proof against the victim of the violations" and that evidence from the "illegal" search should therefore be suppressed. (Document No. 11, p. 6). *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) ("The exclusionary rule prohibits the introduction of derivative evidence both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful conduct."). The undersigned disagrees with Defendant's characterization of the execution of the arrest warrant as "illegal" for the reasons discussed herein. Absent a Fourth Amendment violation, the exclusionary rule has no application here.

### F. Alleged Invalidity of Warrant

At the conclusion of the hearing on July 8, 2009, Hall's counsel asserted for the first time that the arrest warrant was invalidly issued. In supplemental briefing, Hall then argued that "North Carolina law prescribes the protocol that should be used when an officer applies for a warrant to help ensure compliance with the both the federal and North Carolina constitutions." (Document No. 34, p. 1). Specifically, Hall contends that North Carolina state law, at N.C.G.S. § 15A-304, requires an affidavit to be furnished to the reviewing magistrate. Hall argues that Officer Helms did not provide an affidavit as part of the warrant application and merely "provided the state magistrate with police reports, a victim letter, a restitution sheet, and a Mecklenburg County District Attorney Papering Verification Form."

However, Hall reaches an incorrect conclusion by emphasizing an incomplete set of facts. His argument depends on the part of the statute referring to "affidavits" and ignores the part referring to "oral testimony under oath or affirmation before the issuing official." N.C.G.S. § 15A-304. Although Hall insists that an affidavit was required, the state statute actually indicates that probable

cause may be shown by affidavit *or* oral testimony under oath (or both) before the issuing official. N.C.G.S. § 15A-304.

To the extent Hall merely alleges violation of state law, it is well settled that suppression is not warranted as a remedy for non-constitutional violations. *United States v. Hurwitz*, 459 F.3d 463, 472 & n.6 (4th Cir. 2006); and see, e.g., *United States v. Ralph D. Davis*, 313 Fed.Appx. 672, 2009 WL 489998, *2 (4th Cir. (Va.)). Of course, the state statute is designed to be entirely consistent with the federal constitutional requirement under the Fourth Amendment that "no warrants shall issue, but upon probable cause, supported by Oath or Affirmation." U.S. Constitution, amend IV.

Here, the record reflects that the warrant application was 'supported by oath" as required by the Fourth Amendment. Officer Helms indicates that he provided "an oral summary of the investigation" and "swore under oath to the Magistrate that all information I was providing to him was true and accurate to the best of my knowledge." (Document No. 37-2, ¶ 4). The state magistrate heard this testimony, reviewed the documentation, found probable cause, and thereafter issued the warrant for Hall's arrest. The undersigned notes that defense counsel did not ask Officer Helms at either hearing about his oath or any statements provided under oath to the issuing magistrate. Hall's argument is merely based on the erroneous assumption that the officer omitted an affidavit and did not otherwise comply with constitutional requirements. (Document No. 34, pp. 4-5). The record reflects otherwise.

### G. The Good Faith Exception of *Leon*

Moreover, under the well-known "good-faith exception" of *Leon*, evidence obtained during the execution of a warrant may be admissible even if the warrant later is later determined to be defective, provided that the officer reasonably relied on a warrant issued by a detached and neutral

magistrate. *United States v. Leon*, 468 U.S. 897, 921 (1984). An officer's reliance on a warrant is presumed reasonable except in limited circumstances where the officer could have no reasonable grounds for believing that a warrant was properly issued. *Id*. at 922-23. The United States Supreme Court recently reiterated that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 129 S.Ct. 695, 702 (2009). "[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Id.* at 700.

There are four "exceptions" to *Leon's* good-faith exception, namely: (1) when the warrant is based on an affidavit containing "knowing or reckless falsity"; (2) if the issuing magistrate wholly abandoned his judicial role - i.e., when the magistrate simply acted as a "rubber stamp" for the police; (3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. *Leon*, 468 U.S. at 923; *see also, United States v. DeQuasie*, 373 F.3d. 509, 519 (4th Cir. 2004).

To the extent the Defendant fleetingly alleges that Officer Helms presented "misleading information to the magistrate in order to procure the warrant" (Document No. 34, p. 3), this allegation fails to meet even the preliminary requirements for a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), much less the requirements for application of the exclusionary rule. Hall's conclusory allegation is also a significant mischaracterization of the evidence. Nothing in the testimony even remotely suggests that Officer Helms presented anything "false or misleading" to the issuing magistrate, or that Officer Helms sought or relied upon the warrant in bad faith.

On the contrary, the undersigned finds that the testimony plainly reflected that Officer Helms was thorough and conscientious in his adherence to established procedures for obtaining an arrest warrant based upon his investigation of Hall. Consistent with local practice, he sought prior review of the warrant application by the district attorney and then took the supporting documentation to the state magistrate to seek an arrest warrant. Consistent with the state law cited by Defendant (N.C.G.S. § 15A-304), and consistent with federal constitutional requirements, Officer Helms provided a summary of his investigation under oath to the state magistrate. (Document No. 37-2, ¶ 4). The fact that the district attorney approved a misdemeanor charge instead of a felony charge (based on the amount of alleged theft) falls quite short of suggesting that the officer provided "misleading" information. Even supposing that the warrant for Hall's arrest were held invalid for lack of an affidavit, any minimal deterrence that might result from applying the exclusionary rule would not outweigh the heavy cost of excluding otherwise admissible and highly probative evidence. *Herring*, 129 S.Ct. at 696.

To the extent Hall argues that the issuing magistrate acted as a "rubber stamp," the United States asserts that the state magistrate properly issued the arrest warrant based upon probable cause. (Document No. 33, p. 5). The United States points out that Officer Helms "swore under oath to the Magistrate that all information I was providing to him was true and accurate to the best of my knowledge" (Document No. 37-2, ¶ 4). Officer Helms orally summarized his investigation and presented the state magistrate with a 24-page application package of information from his criminal investigation of Hall. The evidence before this Court indicates that established procedures for obtaining a warrant were followed in this case. Other than Hall's own conclusory allegation, nothing of record suggests that the issuing magistrate "wholly abandoned his judicial role."

Hall then makes the attenuated argument that "[b]oth Officer Helms and the magistrate ignored the protocol required for the issuance of an arrest warrant and thus it cannot be said that Officer Helms reasonably relied of the magistrate's determination that probable cause existed for the issuance of the warrant." (Document No. 34, p. 2). As already discussed, the undersigned finds no merit in the premise of this argument. Contrary to Hall's conclusory assertion, the evidence does not establish that Officer Helms and the issuing magistrate ignored "the protocol required for the issuance of an arrest warrant." Officer Helms (and the other officers who executed the arrest warrant) could reasonably rely on the warrant. Even if the warrant were found deficient, application of the exclusionary rule would serve little or no purpose here.

### H. Hall's State Law Argument

Finally, Hall asserts that "the Court should apply the North Carolina Constitution and reject application of the "good faith" exception to defective warrants." Hall contends that "the North Carolina Constitution does not recognize the good-faith doctrine." (Document No. 34, p. 1). Hall asserts this issue for the first time on supplemental briefing, and this argument is outside the scope of the Court's order to file a supplemental brief on a specific issue. In any event, the law of search and seizure under the North Carolina State Constitution and the requirements of the Fourth Amendment to the United States Constitution are the same. Const. Art. 1, § 20; *State v. Gwyn*, 406 S.E.2d 145, 146 (N.C.App. 1991), *rev. denied*, 330 N.C. 199 (1991). The Court need not address any separate state law issues, as the exclusionary rule pertains only to violations of a person's rights under the United States Constitution. No violations of the Fourth Amendment have been shown.

### IV. Conclusion

In conclusion, the Magistrate Judge does not find the Defendant's arguments persuasive. The arrest warrant was validly issued, and even if the warrant were deemed defective, the good-faith exception of *Leon* and its progeny, including *Herring*, would preclude application of the exclusionary rule in this case. The Defendant has not shown that any exceptions to the *Leon* exception should apply. The arrest warrant, together with the facts known to the officers, provided a sufficient basis to permit them to lawfully enter the residence. Although Defendant complains of the duration and scope of the officers' efforts to locate him inside the residence, his own decision to hide is largely responsible. While lawfully inside the residence and while looking only in places Hall could hide, the officers observed a rifle and rifle bag in plain view and lawfully seized them. Defendant has shown no constitutional violations, nor any grounds for suppression.

**IT IS, THEREFORE, RECOMMENDED** that the Defendant's "Motion to Suppress Evidence" (Document No. 11) should be **DENIED**.

## V. Notice of Appeal Rights

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions law and the recommendations contained in this memorandum must be filed within ten (10) days after service of same. *Snyder v. Ridenour*, 889 F.2d 1363, 1365 (4th Cir.1989); *United States v. Rice*, 741 F.Supp. 101, 102 (W.D.N.C.1990). Failure to file objections to this memorandum with the District Court constitutes a waiver of the right to *de novo* review by the District Court, *Snyder*, 889 F.2d at 1365, and may preclude the parties from

raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841, 845-46 (4th Cir.1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.1984).

Signed: September 2, 2009

David C. Keesler
United States Magistrate Judge